UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SETH OYER,

              Plaintiff,                       **DECISION AND ORDER**

        v.                                1:19-CV-01201 EAW

NEW YORK STATE, STATE UNIVERSITY
OF NEW YORK, STATE UNIVERSITY
COLLEGE AT BUFFALO,

              Defendant.
_____

## INTRODUCTION

Plaintiff Seth Oyer ("Plaintiff") claims that defendant New York State, State University of New York, State University College at Buffalo ("Defendant") discriminated against him on the basis of disability and retaliated against him in violation of that Rehabilitation Act, 29 U.S.C. § 794 *et seq.* (Dkt. 7). Pending before the Court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Dkt. 8). For the reasons set forth below, the Court grants Defendant's motion.

## FACTUAL BACKGROUND

The following facts are taken from the Amended Complaint (Dkt. 7), which is the operative pleading. As is required at this stage of the proceedings, the Court treats Plaintiff's allegations as true.

- 1 -

Plaintiff is the holder of a Ph.D. in Crisis Public Relationships from the University of Florida, Gainesville, and was hired by Defendant in August of 2012 as an Assistant Professor in the Communication Department.  (*Id.* at ¶¶ 13-15).  Throughout his employment with Defendant, Plaintiff received "excellent performance reviews" and "good evaluations from his students," while also obtaining seven grants for work pursued in his discipline.  (*Id.* at ¶ 16).

However, "[b]eginning in 2015 when there was a new chair in the [Communication] Department, [Plaintiff] was subject to insults and demeaning comments by his fellow faculty."  (*Id.* at ¶ 18).  Dr. Ronald Smith ("Smith"), a former chairman of Defendant's Communication Department, was "[c]hief among faculty engaging in this behavior[.]"  (*Id.* at ¶ 19).  Smith would "denigrate [Plaintiff's] work and [Plaintiff] personally" and was "supported by all but a few of [Plaintiff's] fellow faculty" in this behavior.  (*Id.*).

Plaintiff was diagnosed with post-traumatic stress disorder ("PTSD") in 2015.  (*Id.* at 20).  Plaintiff states his "therapist believes this condition was brought on by [Plaintiff's] experiences at [Defendant]."  (*Id.*).

Plaintiff reported his PTSD to Defendant.  (*Id.* at ¶ 21).  Plaintiff's PTSD caused him to "miss classes on occasion," though his "work and teaching were always made up" and he "always notified the school when he would be absent."  (*Id.* at ¶ 22).

Following his PTSD diagnosis, Plaintiff "continued to teach and pursue research and fully expected to be granted tenure."  (*Id.* at ¶ 23).  However, in 2017, Plaintiff

"found out that there was information that he was not going to be recommended for tenure."  (*Id.* at ¶ 24).   In particular, Smith was "contacting other faculty in the [Communication Department] and telling them that he was getting [Plaintiff] fired." (*Id.*).   One professor reported these statements by Smith to Defendant's Dean of Arts and Humanities, but no action was taken.  (*Id.* at ¶ 24).

On January 26, 2018, "the ad hoc committee met and unanimously voted to deny [Plaintiff's] tenure and promotion."  (*Id.* at ¶¶ 25-26).   The committee's recommendation was "based on shifting explanations" and "missing materials that had been sent to the committee at the committee's request that were omitted in the report and decision."  (*Id.* at ¶ 26).

Between October of 2017 and May of 2018, Plaintiff "made protests and requests for clarification of his situation with regard to obtaining tenure to" the chair of the Communication Department, the Dean of Arts and Humanities, the Director of Human Resources, the Provost, and the President of Defendant.  (*Id.* at ¶ 28).   Plaintiff "pointed out that the process for assessing whether he rated tenure had not been followed," nor had "the process for following up on his complaints about the school for not following protocol[.]"  (*Id.* at ¶ 29).

On February 9, 2018, Plaintiff filed an informal complaint of disability discrimination and hostile work environment with Defendant's Human Resources Office and "Equity Diversity Office."  (*Id.* at ¶ 30).   In April of 2018, Plaintiff received a copy of a letter from Defendant's Provost to Defendant's President stating that: (1) there were

two student complaints in Plaintiff's 2015 evaluation that he often missed class and was unclear as to course requirements; and (2) Plaintiff fell short of expectations regarding academic achievement.    (*Id.* at ¶¶ 31-32).    Plaintiff found this letter, which "mischaracterized" his publications and "ignored" his success in obtaining grants, "devastating."  (*Id.* at ¶ 32).

On May 2, 2018, Plaintiff mailed the Provost his rebuttal to the ad hoc committee's recommendation.  (*Id.* at ¶ 33).  The Provost responded that "the matter was in the hands of [Defendant's President], who would make the actual decision about granting [Plaintiff] tenure."  (*Id.*).

On May 3, 2018, Plaintiff made a formal complaint of disability discrimination and hostile work environment to Defendant's Chief Diversity Officer.  (*Id.* at ¶ 34).  The Amended Complaint does not set forth how this complaint was investigated, but notes that "[i]n the end the finding was there was no discrimination."  (*Id.*).  On June 18, 2018, Plaintiff received a letter from Defendant's President "noting that his appointment as an Assistant Professor would end as of August 31, 2019."  (*Id.* at ¶ 35).

Plaintiff further alleges that "during the entirety of his last two years with the Defendant," he was "subjected to outrageous, demeaning, intimidating and false accusations by fellow faculty members."  (*Id.* at ¶ 37).  Plaintiff gives specific examples of this conduct:  "Department faculty have said that [Plaintiff] was a detriment to the department, the college and all students publicly as well as in mass emails"; "Department faculty have told [Plaintiff] that he did not have the credentials to teach most . . . public

- 4 -

communication classes" and that he "was not qualified to teach at" Defendant; "Department faculty have told students" that Defendant was "a bad professor"; "Department faculty" have "demeaned [Plaintiff] in front of faculty and students" and "used [him] as an example of everything that is wrong with academia"; "Department faculty have cancelled [Plaintiff's] name for something known as a reading spot with another faculty taking it for himself"; "Department faculty have falsely accused [Plaintiff] of making physical threats against the Dean and Provost"; "Department faculty" have stated both that Plaintiff's classes had no students because students had heard he was "a poor example of a professor" and that Plaintiff's classes were full because he was "known for being an 'easy A'"; and "Department faculty have repeatedly, during mass student advisement sections, defamed [Plaintiff]." (*Id.* at ¶¶ 38-47). When Plaintiff reported these actions, nothing was done. (*Id.* at ¶ 48). To the contrary, the Dean told Plaintiff that he "was to stop defending himself and to tell NO ONE about what was happening to him." (*Id.*).

The circumstances previously described "exacerbated" Plaintiff's PTSD and he "had to take time off due to stress during March 2018." (*Id.* at ¶ 50). Further, because of the "years of insults and degradation" and the "clear and knowing violation of [Defendant's] own rules with regard to the tenure process, [Plaintiff] could no longer stay and resigned effective August 2018." (*Id.* at ¶ 51).

## PROCEDURAL BACKGROUND

Plaintiff commenced the instant action on September 6, 2019.  (Dkt. 1).  Pursuant to a stipulation of the parties (Dkt. 5), Plaintiff filed an Amended Complaint on December 31, 2019 (Dkt. 7).

Defendant filed the instant motion to dismiss on January 31, 2020.  (Dkt. 8). Plaintiff filed his response on February 24, 2020 (Dkt. 10), and Defendant filed its reply on March 2, 2020 (Dkt. 11).

## DISCUSSION

### I.     Legal Standard on Motion to Dismiss

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279 (2017).  To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

## II.   First Cause of Action (Discrimination)

### A.   Legal Standard

Plaintiff's first cause of action is for "Unlawful Discrimination Based On Disability In Violation of the Rehabilitation Act." (Dkt. 7 at 8). Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

To make out a *prima facie* claim of employment discrimination in violation of the Rehabilitation Act, a plaintiff must allege that: "(1) plaintiff's employer is subject to the Rehabilitation Act; (2) plaintiff was disabled within the meaning of the Rehabilitation

Act; (3) plaintiff was otherwise qualified to perform the essential functions of [his] job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [his] disability." *Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 54041 (S.D.N.Y. 2014) (citation and original alterations omitted). Discrimination on the basis of disability may take the form of "disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016).

"[W]hen a plaintiff alleges an employment discrimination claim under the Rehabilitation Act, the causation standard that applies is the same one that would govern a complaint alleging employment discrimination under the ADA [Americans with Disabilities Act]." *Natofsky v. City of New York*, 921 F.3d 337, 345 (2d Cir. 2019), *cert. denied*, 206 L. Ed. 2d 822 (Apr. 20, 2020). In particular, the plaintiff must show that "discrimination was the but-for cause of any adverse employment action." *Id*. at 348.

A plaintiff may also allege a hostile work environment claim under the ADA and the Rehabilitation Act. *See Fox v. Costco Wholesale Corp*., 918 F.3d 65, 74 (2d Cir. 2019); *Jackson v. N.Y.C. Dep't of Educ*., 768 F. App'x 16, 18 (2d Cir. 2019). As one court in this Circuit recently explained:

> For purposes of a claim of a disability-based hostile work environment under the Rehabilitation Act, a plaintiff must show that: (1) [he] suffered conduct that was objectively severe or pervasive enough to alter [his] employment conditions and create an abusive working environment; (2) [he] subjectively perceived the conduct as abusive; (3) there is a specific basis for imputing the conduct to [his] employer; and (4) the conduct occurred because of [his] disability.

*Barrett-Browning v. Dep't of Corr.*, No. 3:18-CV-01732 (JAM), 2020 WL 5118132, at
*4 (D. Conn. Aug. 31, 2020).

### B.    <u>Disability Within the Meaning of the Rehabilitation Act</u>

The Court agrees with Defendant that Plaintiff has not plausibly alleged a
discrimination claim under the Rehabilitation Act.  As a threshold matter, the Court finds
that Plaintiff has not plausibly alleged that he is disabled within the meaning of the
Rehabilitation Act.

"The Rehabilitation Act defines the term 'individual with a disability' by cross
reference to the Americans with Disabilities Act."  *Martinez v. N.Y. State Div. of Human
Rights*, No. 1:13-CV-1252-GHW, 2015 WL 437399, at *5 (S.D.N.Y. Feb. 2, 2015)
(citing 29 U.S.C. § 705(20)(B)).   "The ADA defines a disability as '(A) a physical or
mental impairment that substantially limits one or more major life activities of such
individual; (B) a record of such an impairment; or (C) being regarded as having such an
impairment (as described in paragraph (3)).'"  *Alexiadis v. N.Y. Coll. of Health
Professions*, 891 F. Supp. 2d 418, 428 (E.D.N.Y. 2012)  (quoting 42 U.S.C. § 12102(1)).
Effective January 1, 2009, "Congress enacted the ADA Amendments Act of 2008
('ADAAA') . . ., which expanded the class of individuals entitled to protection under the
ADA."  *Id.*  In particular, the ADAAA rejected the Supreme Court's analysis in *Sutton v.
United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Manufacturing v. Williams*, 534

U.S. 184 (2002), which had strictly defined disability under the ADA.  *See id.*  As one court in this Circuit has explained:

> The ADAAA expanded the interpretation of the ADA's three-category definition of "disability."  For example, "major life activity" includes "caring for oneself, performing manual tasks . . . walking, standing, lifting, bending, speaking, breathing . . . and working," as well as "the operation of a major bodily function." including "neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."

*Hutchinson v. Ecolab, Inc.*, No. 3:09-cv-1848(JBA), 2011 WL 4542957, at *8 (D. Conn. Sept. 28, 2011) (quoting Pub. L. No. 110–325, 122 Stat. 3553, 3555 (2008)).

"To determine whether or not a plaintiff suffers from a disability, the Supreme Court compels district courts to follow a three-step process[.]"  *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 145 (E.D.N.Y. 2018).  Specifically, the Court must assess "(1) whether plaintiff had an impairment; (2) whether the impairment affected a 'major life activity' within the meaning of the ADA; and (3) whether that major life activity was substantially limited by the impairment."  *Mazza v. Bratton*, 108 F. Supp. 2d 167, 173 (E.D.N.Y. 2000) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)).

Plaintiff has satisfied the first of these prongs, having alleged that he suffers from PTSD.  As to the second prong, Plaintiff has also plausibly alleged that his PTSD had some effect on his work.  However, Plaintiff has not satisfied the third prong, because he has not plausibly alleged that any impact his PTSD had on his ability to work was substantial.  To the contrary, Plaintiff alleges that his PTSD merely caused him to "miss classes on occasion" and that notwithstanding the effects of his condition and without any

accommodation, he "made up all classwork and administrative responsibilities missed" and "met every requirement for being granted tenure." (*Id*. at ¶¶ 22, 64-65).

In assessing whether an impairment "substantially limits" a major life activity, the Court compares a plaintiff's ability to perform such activity to "most people in the general population." *Martinez*, 2015 WL 437399, at *6 (citation omitted). The need for a professor to occasionally miss a class and make up the work thereafter does not satisfy this standard, as virtually all employees must occasionally be absent from work. Plaintiff's factual allegations are inconsistent with the conclusion that his PTSD substantially limits his ability to perform work, and he has therefore not plausibly alleged that he is disabled within the meaning of the Rehabilitation Act. *See Pineda v. ESPN, Inc.*, No. 3:18-CV-325 (MPS), 2018 WL 5268123, at *3 (D. Conn. Oct. 23, 2018) (dismissing claim of disability discrimination based on PTSD where the plaintiff alleged generally that her PTSD symptoms interfered with her ability to work but failed to specify "how those symptoms impacted her ability to perform her job as an Associate Producer"); *Benuzzi v. Bd. of Educ. of City of Chicago*, No. CIV.A 09 C 3510, 2010 WL 2169488, at *6 (N.D. Ill. May 27, 2010) (finding that condition causing "infrequent" absences did not substantially limit a major life activity), *aff'd in part, vacated in unrelated part*, 647 F.3d 652 (7th Cir. 2011).

Plaintiff also has not plausibly alleged that Defendant regarded him as having a disability. While Plaintiff alleges that he reported his PTSD diagnosis to Defendant and that he used his "sick days, vacation days, and other time off" to make up work and that

he "made this known to his employer," these allegations do not establish that Defendant regarded Plaintiff as disabled.  *See Laface*, 349 F. Supp. 3d at 147 ("While the Plaintiff has alleged that he informed the Defendants of his disability, he has not alleged that his employer . . . regarded him as disabled under the ADA.").  The Amended Complaint is devoid of any allegations whatsoever regarding Defendant's view of Plaintiff's condition.

### C.   Discrimination Because of Disability

Further, even assuming Plaintiff had plausibly alleged a qualified disability (or the perception thereof), he has not plausibly alleged that he was subject to an adverse employment action or a hostile work environment on that basis.  In his Amended Complaint, Plaintiff asserts that Defendant "refused Plaintiff a reasonable accommodation based on his disability."  (Dkt. 8 at ¶ 60).  However, Plaintiff also acknowledges that he "did not specifically request an accommodation" and contends that he "made up all classwork and administrative responsibilities missed due to the effects of his treatment" and "met every requirement for being granted tenure."  (*Id.* at ¶¶ 55-57).  Plaintiff has not plausibly alleged that he was improperly denied an accommodation.  *See Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 18-19 (2d Cir. 2015) ("[A]n employer cannot refuse to make an accommodation that it was never asked to make[.]" (quotation, citations, and original alterations omitted)).

In response to Defendant's motion to dismiss, Plaintiff argues that "the issue raised is not whether the Plaintiff was accommodated, but whether he was denied tenure because of his disability."  (Dkt. 10 at 11).  While this argument is contrary to the plain

language of the Amended Complaint—which, as noted above, expressly alleges a failure to make reasonable accommodation—the Court nonetheless considers whether Plaintiff has plausibly alleged that he was denied tenure under circumstances giving rise to an inference of discrimination and concludes that he has not.

Accepting Plaintiff's version of events, the faculty of the Communication Department, led by Smith, denigrated him and his teaching style and accomplishments prior to his PTSD diagnosis, and this behavior continued thereafter. Smith then sabotaged Plaintiff's application for tenure in 2017, and Defendant failed to follow its own policies and protocols in making the tenure determination. As Defendant concedes, these allegations could potentially support a "state court Article 78 proceeding" as to the claimed failure to follow appropriate procedure. (Dkt. 11 at 6).[1] What they cannot support is an inference that Plaintiff's PTSD was the but-for cause of his failure to obtain tenure.

"A plaintiff may demonstrate circumstances giving rise to an inference of discrimination through evidence of overt discriminatory conduct or disparate treatment." *Santiago v. 1199 SEIU*, No. 18-CV-06711 AMD RLM, 2020 WL 4350048, at *4 (E.D.N.Y. July 29, 2020) (quotation omitted). Here, Plaintiff has not alleged any facts suggesting similarly situated individuals without disabilities were treated more favorably than he was with respect to tenure. To the contrary, the Amended Complaint is devoid of

---

[1]     To be the clear, the Court does not read the Amended Complaint as alleging a state law procedural claim and therefore does not reach the merits of any such claim by Plaintiff.

any allegations regarding any other individual's tenure assessment process—in particular,
Plaintiff does not allege that the rules and protocols that were not followed in his case
were followed when assessing whether to grant tenure to a similarly situated, non-
disabled employee.    Nor has Plaintiff "articulate[d] sufficient facts, such as any
discriminatory comments, to suggest that . . . [the denial of tenure] occurred as the result
of a disability-based animus."  *Wallace v. Esper*, No. 18-CV-6525 (RA), 2019 WL
4805813, at *7 (S.D.N.Y. Sept. 30, 2019).  Instead, Plaintiff's own allegations indicate
that he was denied tenure because Smith, whose animus predated his PTSD diagnosis,
influenced the other Communication Department faculty against Plaintiff.

Plaintiff argues that discriminatory animus can be inferred from the fact that
Defendant's Provost's April 2018 letter to Defendant's President referenced two student
complaints that Plaintiff often missed class.  (*See* Dkt. 10 at 11).  However, Plaintiff has
not alleged that those student complaints formed any part of the basis for his tenure
denial, nor has he explained what role, if any, the Provost played in such denial.  He
particularly has not alleged that the Provost's letter was the proximate cause of his failure
to obtain tenure.  *Cf. Natofsky*, 921 F.3d at 350-51 (assuming without deciding that "cat's
paw" theory of liability, wherein "a discriminatory motive may be imputed to a final
decision-maker if the decision-maker's adverse employment action was proximately
caused by a subordinate who had a discriminatory motive and intended to bring about the
adverse employment action," applies to Rehabilitation Act claims (quotation omitted)).
This single, isolated reference to student complaints of excessive absenteeism, without

- 14 -

more, does not render Plaintiff's allegation that he was denied tenure because of his disability plausible.[2]

For similar reasons, Plaintiff has not plausibly alleged a hostile work environment claim under the Rehabilitation Act. To support such a claim, Plaintiff must show that the hostility at issue was because of his disability. *See Barrett-Browning*, 2020 WL 5118132, at *4. He has not plausibly alleged that this was the case. Instead, Plaintiff's own allegations establish that Smith and his other colleagues in the Communication Department disliked and treated him poorly before he allegedly became disabled, thereby dispelling any inference that their treatment was because of his PTSD. While their behavior may have been offensive and objectionable to Plaintiff, "[t]he Rehabilitation Act does not set forth a general civility code for the American workplace." *Lee v. Berryhill*, No. 15 CIV. 1472 (KPF), 2019 WL 367834, at *5 (S.D.N.Y. Jan. 30, 2019) (quotation omitted), *aff'd sub nom. Lee v. Saul*, 802 F. App'x 663 (2d Cir. 2020).[3]

---

[2]     The Court further notes that the two student complaints were apparently from 2015 (*see* Dkt. 7 at ¶ 31), the same year that Plaintiff was diagnosed with PTSD (*id.* at 20). Because Plaintiff has not provided any additional information about the timing of either his evaluation or his diagnosis, it is not even clear that these student complaints occurred after Plaintiff developed his allegedly disabling condition.

[3]     Defendant has also argued that Plaintiff has not plausibly alleged that he was qualified to perform the essential functions of a tenured professor, based on the many complaints his fellow faculty made against him. (Dkt. 8-1 at 17-18). This argument is without merit—Plaintiff has alleged that the complaints his fellow faculty made were false and mischaracterized his works and accomplishments, and the Court must assume that is true for purposes of the instant motion. However, the Court's rejection of this argument by Defendant does not change its ultimate conclusion that Plaintiff's discrimination claim is not plausibly alleged.

For all these reasons, the Court grants Defendant's motion to dismiss as to Plaintiff's first cause of action.

## III.  Second Cause of Action (Retaliation)

Plaintiff's second cause of action is for "Retaliation in Violation of the Rehabilitation Act." (Dkt. 7 at 9). "The elements of a retaliation claim under either the Rehabilitation Act or the ADA are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky*, 921 F.3d at 353 (citation and alterations omitted).

Defendant argues that Plaintiff has not plausibly alleged retaliation because the ad hoc committee unanimously voted to deny him tenure before he engaged in protected activity. (Dkt. 8-1 at 22-23). The Court agrees. The only basis for inferring a causal connection that Plaintiff has identified in this case is the temporal proximity between his discrimination complaints in February and April of 2018 and the finalization of the tenure denial in June 2018. (*See* Dkt. 10 at 14-15)[4]. However, it is well-established that

_____

[4]    Plaintiff also argues, without further elaboration, that Defendant has "ignore[d]" his "statements of having asked about his possibility of tenure as early as October 2018 [sic]." (Dkt. 10 at 15). It is unclear to the Court what significance Plaintiff thinks those statements have. To the extent he is implying that they could qualify as additional protected activity, he is mistaken. "Protected activity" is defined as "action taken to protest or oppose statutorily prohibited discrimination." *Natofsky*, 921 F.3d at 354. Importantly, to qualify as protected activity, the plaintiff's conduct must have been such that an employer would "have understood, or could reasonably have understood, that the

"[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see also Baez v. New York*, 629 F. App'x 116, 119 (2d Cir. 2015) ("[T]he fact that the alleged retaliatory course of conduct began long before" the plaintiff's protective activity "undercuts any inference of a causal connection between the two."). Here, the course of conduct that resulted in the denial of Plaintiff's tenure was already well underway before Plaintiff made his first informal complaint of discrimination in February 2018. Accordingly, Plaintiff has not plausibly alleged a claim of retaliation, and the Court grants Defendant's motion to dismiss as to Plaintiff's second cause of action.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Amended Complaint (Dkt. 8) is granted. The Clerk of Court is direct to close this case.

---

plaintiff's opposition was directed at" unlawful discrimination. *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013). Plaintiff's inquiries regarding the status of his tenure process and complaints that Defendant was not following its own protocols, without any reference to his disability, do not satisfy this standard. *See Natofksy*, 921 F.3d at 353-54 (holding that challenge to demotion was not protected activity because the plaintiff did not give any indication that he was protesting discrimination).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: September 22, 2020
         Rochester, New York